**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 1:18-cr-04176-JB |
| STERLING ISLANDS, INC.,<br>AL-ZUNI GLOBAL JEWELRY, INC.,<br>JAWAD "JOE" KHALAF,<br>NADER KHALAF,<br>NASHAT "NASH" KHALAF,<br>ZAHER MOSTAFA, and<br>TAHA "TOM" SHAWAR | |
| Defendants | |

**SENTENCING MEMORANDUM ON BEHALF OF
JAWAD "JOE" KHALAF**

Defendant Jawad "Joe" Khalaf submits this sentencing memorandum in advance of

sentencing set for Wednesday, August 26, 2020.[1] Joe Khalaf has previously submitted his

Objections to the Presentence Report ("PSR") [Doc 133]. Those objections square with the

government's objections, including the ultimate conclusion that "Probation's recommendation of

the loss amount is not . . . a reasonable estimate," and that "the pecuniary loss in this case should

be the amount of money purchasers spent on imitation Native American-style goods that were

---

[1] Jawad Khalaf and Nashat Khalaf worked closely on their sentencing memoranda. A significant portion of the memoranda overlap. There are also differences that pertain to unique differences between Jawad and Nashat. For example, the background sections in the two memoranda are virtually identical. In the discussion Section A(1) related to the Khalaf's family are similar, as well as the portion of that section related to the dangers COVD presents. Finally, Section (A)(6) related to the factor involving ensuring that the punishment is just and the sentence is not disparate are also virtually identical.

offered or displayed **at Al-Zuni Global Jewelry**." Gov't Obj [Doc. 138], at 3-4 (emphasis added). Consistent with that proper framing of what properly should drive the Court's sentencing analysis, all of the factors that the Court must consider under 18 U.S.C. § 3553(a), including Joe Khalaf's characteristics, support that the Court properly should sentence Joe Khalaf to a probationary sentence under the Rule 11(c)(1)(C) Plea Agreement.

## BACKGROUND

As this Court is aware, Joe Khalaf was indicted and eventually pled to Count V of the Indictment, "18 U.S.C. §§ 1159 and 2, that being Misrepresentation of Indian Produced Goods and Services in an amount greater than $1,000.00, and Aiding and Abetting." Plea Agreement [Doc. 115] ¶ 3. The plea encompasses the entire scope of the criminal conduct that the government came to find a preponderance of the evidence established Joe and his co-Defendants engaged in: a single incorrectly identified display of silver canteens at Al-Zuni Global Jewelry, Inc., in Gallup, New Mexico on October 28, 2015. *Id.* ¶ 10. Joe Khalaf, a United States citizen since 1971, has no prior criminal history and many mitigating factors, addressed both in the PSR and here.

Following years of discussions with the government outlining the material gap between the theories that drove the indictment and the actual evidence in the case, the government scrutinized the evidence behind the United States Fish and Wildlife Service ("USFWS") reports and found that the actual evidence – as opposed to the USFWS reports on that evidence – limits substantially what it could prove both in terms of charges and in terms of issues that drive a proper calculation of Joe Khalaf's Guidelines sentence. The government entered stipulations in the Plea Agreement acknowledging those evidentiary limitations. These stipulations that reflect the evidence include the government's concession that it could not prove an intended loss

amount of more than $6,500.00 overall, and that Joe Khalaf was not "an 'organizer,' 'leader,' 'manager,' or 'supervisor,' . . . as that term is defined in USSG § 3B1.1." Plea Agreement ¶¶ 12(c) & (e). Had the PSR accurately reflected this loss amount and Joe Khalaf's true role, then Joe Khalaf's offense level would have been 4, the advisory guideline sentence would have been 0-6 months, and a guidelines sentence specifically would permit imposition of probation only. *See* USSG Sentencing Table, Ch. 5, Pt. A; USSG § 5B1.1(a)(1).

The government agrees that the PSR is not correct: "To be sure, the Court need only make a reasonable estimate of the loss. U.S.S.G. § 2B1.1, Application Note 3(C). Probation's recommendation of the loss amount is not, however, a reasonable estimate." Gov't Obj, at 4.[2] The Court should instead calculate the Guidelines sentence in line with what the government's stipulations show the evidence would and would not support. Stated differently, there is a glaring gap between the case portrayed in the indictment and the narrow case for which Joe Khalaf comes before the Court for sentencing, and justice and the limitations of the evidence both require that his sentence reflect the limitations on the case the Plea Agreement reflects. The PSR does not do that, and instead tries to dramatically alter the Guidelines sentence here based on assumed facts the government has stipulated it cannot meet its burden to prove for sentencing. Joe Khalaf writes here to explain why a sentence to probation is appropriate in this case.

_____

[2] Joe Khalaf does take issue with this statement in the government's objections: "While undoubtedly there were purchasers of Indian-style goods at Al-Zuni Global Jewelry who were misled by the manner in which goods were offered or displayed into believing that they were purchasing Indian products," [Doc. 137 at 4-5] The government has no evidence of any such purchases or of any other instance of misleading purchasers than the one Joe Khalaf has pled guilty to in this case. The evidence shows that both at Al-Zuni Global Jewelry and at shows that Nash Khalaf attends, Al-Zuni Global Jewelry is rigorous in identifying the source of the jewelry it offers. There is no evidence of anyone being misled.

## **DISCUSSION**

As a preliminary matter, 18 U.S.C. §3553 directs that the sentence imposed must be sufficient, ***but not greater than necessary*** to comply with its purposes. In coming to the appropriate sentence, a court should consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and sentencing range established [by the sentencing guidelines];

(5) any pertinent policy statement;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

From an examination of Joe Khalaf's case through the lens of these factors, a sentence of probation complies with the purposes and goals of the sentencing statute in this matter;

incarcerating this 72-year-old man with no criminal history serves no legitimate sentencing purpose.

A.     **The 3553(a) Factors**

1.     <u>The nature and circumstances of the offense and the history and characteristics of Joe Khalaf.</u>

a.     *Joe Khalaf and his family.*

The Khalaf family first immigrated to America from Palestine in 1912, when Joe Khalaf's grandfather Abdullah and his great uncle Ali arrived at Ellis Island on the first ship from the Middle East. Abdulla worked various jobs and eventually opened a textile shop in New York.  He later moved back to Palestine, where he became a highly respected mayor of his hometown and served as a Member of Jordan's Parliament.

Abdullah's son, Tawfiq (Tom), immigrated to America in 1948 when he was twenty-six years old. He loved America and its people, freedoms and opportunities, and communicated that affection to his four sons, Rafat (Ralph), Ismat (Bob), Nashat (Nash) and Jawad (Joe).

Tom spent most of his working years as a successful traveling salesman, initially selling textiles and later Native American jewelry. He was soft-spoken and charming, with a reputation for scrupulous honesty. He made everyone around him feel good, and his ability to close a sale was unmatched. He was loved and admired by those who knew him.

The boys were raised by their mother, Khaldieh, a strong, God-fearing woman whose love and strictness made them who they are. Some of the events of their childhood remain topics of family lore, such as when son Ralph stayed out in winter a little after his mother's curfew and returned to a locked door. Despite his knocking and pleas, Khaldieh was unrelenting.  He slept in the cold outside the front door. Joe and his brothers revere her and consider her the most important person in their lives.

The family was of humble means, living with their mother in a Palestinian village, while their father was in the U.S. The boys always dreamed of coming to America. When the U.S. Consulate approved their visas, sponsored by their father, their dreams came true and they went off to what they regarded then – and still regard – as the greatest country on earth.

Joe and Nash, ages 17 and 18 at the time, landed in San Francisco in 1966, joining their father and older brother, Ralph. Their mother, Khaldieh, joined them three years later.

   b.   *Joe Khalaf's business development and career.*

The brothers started in their father's footsteps as traveling salesmen of tapestries and textiles. They drove across the country, going door-to-door, selling unique wall coverings, rugs, sofa coverings, and bedspreads that were imported from Belgium.

Joe Khalaf is now seventy-two, has lived in New Mexico and the American Southwest – New Mexico, Arizona, and Colorado – since the late 1960s. Joe[3] and his brother Nash began selling rugs and bedspreads in New Mexico in the early 70s. During those sales trips, Joe and Nash met and came to know many members of the Zuni, Navajo, Santo Domingo, and Hopi tribes. They felt, correctly as it turned out, that they could make a business selling jewelry to people all over the country and, later, all over the world.

The Khalaf brothers grew and branched out to open retail stores in New Mexico, Colorado, and Arizona. In the late 1980s, Joe and his son moved to Colorado and operated three stores in which they sold Native American jewelry.

In 1996, Joe and his son moved to Albuquerque to start a jewelry manufacturing business. Having worked in the wholesale and retail jewelry business selling southwestern-style

---

[3] Although counsel would normally refer to their client by his last name only, they used Joe's first name here to avoid confusion with his brother.

jewelry, Joe came to identify that retail shops could not succeed if they carried only Native

American jewelry. Native American jewelry was limited in variety and price points, and

appealed to only a small niche of buyers; retail businesses needed more variety of items to sell to

a broader segment of the population to survive. That included selling southwestern-style jewelry

that was available in a far greater selection of colors, styles, sizes, and price points than

traditional Native American-made jewelry, and at a lesser price point. Helping these retail stores

succeed is critically important to the Native Americans artisans, because these stores generate

most, if not all, of their jewelry-making income. Every party to this action acknowledges, as they

must, that making and selling such jewelry is legal. And Joe's business model from this point

forward was based on selling overseas manufactured arts and crafts that fell into this

southwestern style.

Joe's manufacturing business began by stringing beads and casting charms, and grew to

the point where Joe founded Fashion Accessories 4 U ("FA4U") to manufacture fashion and

southwestern-style jewelry that Sterling Islands sold. Much of the jewelry that Sterling Islands

sold was in a contemporary style, and not in a traditional Native American style. All of it was

marked with the country of origin, as having been made in the Philippines. The government

produced no evidence in discovery in this case or, to counsel's knowledge, anywhere else, that

Joe or anyone at Sterling Islands knew that the purchasers of the jewelry intended to pass it off,

or did pass it off, unlawfully as having been made by Native Americans. Rather, the evidence in

the government's investigative files establishes that each piece of Sterling Islands jewelry that

Sterling Islands imported from FA4U was marked "Made in Philippines." The evidence in the

government's investigative files also establishes that Sterling Islands' employees were diligent in

making sure their customers understood that the jewelry was produced overseas, were not Native

American, and that to represent them as otherwise violates the law. In addition to marking each item individually with the country of origin, Sterling Islands displayed prominently on the bottom of reach of invoice a disclaimer that the goods are made in the Philippines, Sterling Islands does not sell Native American jewelry, and to misrepresent the goods as anything other than Philippines-made violates the law:

> Goods are made in the Philippines and labeled/packaged accordingly. We do NOT sell Native American jewelry and make no verbal or written claims as such. Resellers are reminded that misrepresenting our jewelry as anything other than Philippines-made is against the law, and we will not be liable for such violations.

Bates 00364, Ex. A (also attached as Exhibit 10 to Joe's PSR Objections, Doc. 133-10). Additionally, the government executed search warrants on Sterling Islands' email accounts. In the execution of those warrants, the government could not find one single email in which Sterling Islands' employees misrepresented the jewelry, said or inferred the customer may misrepresent the jewelry, or said or inferred that Sterling Islands may have any knowledge its jewelry may have been misrepresented by a purchaser. Rather, the emails produced demonstrate that, even in private e-mail conversations with prospective buyers, Sterling Islands' employees were diligent about making sure their customers knew the jewelry was not Native American-made, that it violates the law to misrepresent the jewelry as such, and that only the end-consumer of the jewelry legally may remove the "Made in the Philippines" markings on the jewelry. *See*, *e.g.,* Bates No. 02610, Ex. B at 3 (attached as Ex. 3 to Joe's PSR Objections, Doc. 133-3, at 3).

Sterling Islands' approach to marking its jewelry by indicating the country of origin on the packaging is consistent with the industry standard. *See*, *e.g.*, Jewelry Examples, Ex. C (attached as Exs. 13 & 14 to Joe's PSR Objections, Doc. 133-13, Doc. 133-14).

These facts support fully the government's acknowledgment that a preponderance of the evidence does not support a loss amount in excess of $6,500. They also support that "Probation's

recommendation of the loss amount is not . . . a reasonable estimate," and that "the pecuniary loss in this case should be the amount of money purchasers spent on imitation Native American-style goods that were offered or displayed *at Al-Zuni Global Jewelry*." Gov't Obj, at 3-4 (emphasis added).  But even when the loss amount properly is cabined to just Al-Zuni Global Jewelry, the government produced no evidence that purchasers ever spent any money on imitation Native American-style goods that were offered or displayed at Al-Zuni Global Jewelry *as Native American-made*. The only evidence of criminal conduct by any Defendant in this case that the government produced is that from the one occasion that led to Joe and Sterling Islands' pleas in this case: the location of a box at Al-Zuni Global Jewelry of imported, decorative "canteens" on a shelf  labeled as Native. But this box was on display when the search warrant was executed at Al-Zuni Global Jewelry; therefore, there's no evidence any purchaser spent money on these "canteens" that were improperly located.

Although it appears from the government's discovery that one or more of the undercover agents' visits to Al-Zuni Global Jewelry were not recorded – even though the US Fish and Wildlife Service Report asserts otherwise – one visit was recorded. And that recorded conversation makes clear that the Al-Zuni Global Jewelry employee, Defendant Zaher Mustafa, was rigorous in explaining the origin of the pieces the agents purchased and wanted to see. He even attempted to correct them when the agents suggested to each other that they could pass off an inlay item as Zuni but they cut him off. *See* Canteen Tr. at 14-15, Ex. D (attached to Joe's PSR Objections, Doc. 133-1, at 14-15).

In this regard, the Court should understand something the Fish and Wildlife Service ("USFWS") agents and others, including the Probation Officer who authored the PSR, appear not to understand: There is no legal prohibition on *anyone* making or selling items of jewelry that

are, indeed, Native American-style, including even exact copies of Navajo, Hopi or Zuni pieces, so long as the vendor does not attempt to pass them off as Native American when they are not. The regulations implementing the American Indian Arts and Crafts Act state: "A non-Indian can make and sell products in the style of Indian art or craft products only if the non-Indian or other seller does not falsely suggest to consumers that the products have been made by an Indian." 25 C.F.R. § 309.9.  This reality, again, supports why the government objects to the PSR's improper inclusion of the Sterling Islands as offense conduct; there simply is no evidence that Sterling Islands, let alone Joe individually, ever intended – or even knew – that Sterling Islands' jewelry would be passed off as Native American-made.

In addition to the consistent conscientious representations that Sterling Islands made, which are referenced above, Sterling Islands asked FA4U to begin stamping its jewelry with "PHILIPPINES" before the USFWS agents executed the search warrant on Sterling Islands. The PSR never acknowledges this. Instead, it emphasizes: "[n]otably, none of the thousands of pieces of jewelry examined by agents was indelibly marked with the country of origin." PSR ¶ 41. As the government disclosed later on in discovery, however, on the day the agents executed the search warrant, they examined several pieces of jewelry that had been marked: "PHILIPPINES." *E.g.,* Bates No. 02457-02458, 2470, 2486-87, Ex. E. Sterling Islands' request of FA4U to mark this jewelry in that manner, as opposed to marking the packaging, before they ever knew that there was any investigation or that they faced criminal accusations shows that neither Sterling Islands nor Joe had any criminal intent to misrepresent the jewelry. The reason that Sterling Islands made this request is not that they believed that the law required such marking – which, whether the law requires that is still an open question – but they did so because Amazon.com

implemented a requirement that Sterling Islands mark its jewelry as such to continue to sell it on Amazon.

As more fully laid out in Joe's Objections to the Presentence Investigation Report [Doc. 133] ("Joe's PSR Objections"), the USFWS and Probation misunderstand completely what a preponderance of the evidence establishes. The government, on the other hand, acknowledges that, as discovery unfolded over the course of three years with this case, and as the government looked at the evidence, a preponderance of the evidence supported that the only culpable conduct in which Joe, Sterling Islands, or Nashat Khalaf and Al-Zuni Global Jewelry, participated was knowingly displaying a box of canteens in a manner in which they could be mistaken for Native American-made.

Joe operated Sterling Islands lawfully. More than that, he operated it conscientiously. The error with the box of canteens has cost him dearly – he will now be a convicted felon with all the harm and condemnation that comes with that label. There is no evidentiary basis for sentencing him as if every dollar associated with his business is tainted by that error. Thus, the nature and circumstances of the offense and the history and characteristics of the defendant support that the Court properly should sentence Joe to, at most, a term of probation.

2.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

As relayed in the PSR: "The instant offense is non-violent in nature and represents the defendant's first felony conviction." PSR at ¶100. It also represents his first charge for any crime, felony or misdemeanor; period. In relation to the seriousness of the offense, certainly violation of the law is serious. However, § 1159 of the Indian Arts and Crafts Act provides for both a misdemeanor and felony offense. The difference between conviction for a misdemeanor and that for a felony is whether, as applicable here, the goods displayed for sale are less than

$1,000 or equal to or greater than $1,000. *See* 18 U.S.C. § 1159(b)(1). The conduct to which Joe Khalaf pleaded guilty is to the ***display*** – not sale – of one box of canteens. Approximately 12 canteens were in the box, which, at a reasonable market value of $85 each, put the total amount at $1,020, which is just over the misdemeanor amount. With $20 more than a misdemeanor amount, Joe will now be a convicted felon. He'll be under the severe consequences that go along with being a convicted felon, as well as the stigma. The severe consequences of being convicted of a felony, losing the important rights that come along with that conviction, and the stigma that attaches to Joe Khalaf, given the amount at issue surpasses just barely the minimum amount for a felony charge, reflect properly the seriousness of the offense.

Moreover, in the precedent sentencings of Manasra, Morris, and Alvarez (discussed in detail, *infra*), their conduct was far more culpable than Joe Khalaf's conduct, and none were sentenced to any term of incarceration. All those defendants intentionally, and brazenly, duped customers into believing that the customers were purchasing Native American-made products. Here, the conduct of which Joe Khalaf was convicted was the displaying for sale of a box of canteens in a way in which customers reasonably may have believed that the canteens were Native American-made. But the remainder of the jewelry that Sterling Islands sold and offered for sale was marketed as overseas-made, was marked as overseas-made, and was sold under circumstances and with a warning that to represent it as anything other (or for anyone other than the end-consumer to remove the country-of-origin marking), is unlawful. In relation to the offense conduct at Al-Zuni Global Jewelry that the government recognizes may be a proper basis for relevant conduct, aside from the box of canteens, all the remainder of Al-Zuni Global Jewelry's overseas jewelry was marked as overseas-made and customers were told which was which. Thus, given the different levels of culpability between Joe versus that of Manasra, Morris

12

and Alvarez, who were not sentenced to incarceration, a felony conviction with a sentence of

probation reflects the seriousness of the offense.

Moreover, the Court has recognized that it "can . . . take into account the problems with

the United States' case." *United States v. Summers*, 506 F. Supp. 2d 686, 698-99 (D.N.M. 2007)

(Browning, J.). Here, the government's case had substantial problems as explained in detail in

Joe's PSR Objections [Doc. 133] and in the government's Objections as well [Doc 138]. Overall,

all of these factors speak to the Court sentencing Joe to a sentence of Probation as being the just

sentence in this case.

Additionally, to determine the just punishment for Joe Khalaf, the Court must consider

how he would serve his sentence if sent to prison – in contrast to the many ways he would

continue to benefit his family and his community if he were to be given a sentence of probation.

Because of the COVID-19 crisis, sentencing a seventy-two-year-old to incarceration presents

mortal health risks. Joe Khalaf, due to his age and a history as a lifelong heavy cigarette smoker,

will be at grave risk of contracting COVID-19 and suffering the severe consequences if he does.

CDC Corona Virus Disease 2019 (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/older-adults.html) (last visited August 11, 2020). *see also* Letter from Dr. Sandro

Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020),

https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-

Trump.pdf (co-signed by numerous public health officials from leading medical and public

health institutions) ("First, we ask that you commute sentences for ***all elderly people.*** While the

SARS-CoV-2 virus infects people of all ages, the World Health Organization (WHO) is clear

that older people are at a higher risk of getting severe COVID-19 disease and dying. In fact, the

risk of severe disease gradually increases with age starting from around 40 years. Also, older

people who are released from prison pose little risk to public safety.") (Emphasis in the original).

Joe Khalaf would spend any incarceration in the current COVID-19 lockdown conditions similar to solitary confinement. It is unclear in which New Mexico facility Joe would serve any sentence. But whichever facility that ends up being, the consequences are equally dire. There have been hundreds of cases at several of the New Mexico jails that house U.S. Marshals Service inmates. Many persons serving their prison sentences in New Mexico do so at the Otero County Prison or the Cibola County Detention Center. As this Court is most likely already well-aware, both of those facilities are experiencing mass outbreaks of COVID-19 cases, with the latest count being 280 and 313 cases respectively. https://cv.nmhealth.org/2020/08/10/updated-new-mexico-covid-19-cases-now-at-22444/ (last visited August 11, 2020). Some of those cases are considered recovered, but that consideration isn't reached through testing; it's reached apparently by observing the inmate. Other New Mexico facilities have begun to identify cases and this is only predicted to spread. CDC guidance, such as social distancing, is simply "impossible to achieve in [] prisons"—particularly during a lockdown.[4] Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings.[5]

---

[4] Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited August 11, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

[5] *See, e.g.*, *Wilson v. Williams*, --- F. Supp.3d ---, 2020 WL 1940882, at *3 (N.D. Ohio Apr. 20, 2020) (acknowledging that soap and disinfectant "can only be so useful in an environment where the inmates are constantly in close proximity to one another. Likewise, the education about hygiene and social distancing [BOP] tout[s] is only effective if the inmates have the supplies and physical space to put such knowledge into practice."); Facility Evaluation: Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 20-cv-1590 (E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Detainees [at MDC Brooklyn] do not have access to adequate

Nothing can ensure Joe's safety in any prison—and a possible death sentence cannot be just in this case. The Court should account for the life-threatening and oppressive nature of confinement by sentencing Joe to a period of probation. Under these circumstances, and given the acute risks that the COVID-19 epidemic presents to Joe if he is sentenced to other than probation, a sentence of probation reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.

       3.      <u>The need for the sentence imposed to afford adequate deterrence to criminal conduct.</u>

The mere criminal conviction and attached stigma is enough to deter Joe Khalaf from a second run-in with the law more than seven decades into his life. The addition of the over $600,000.00 in monetary penalties, plus the attorney's fees he has incurred and the stress and looming dread this case has imposed on to Joe and his family over the past several years certainly is. Joe has learned an extremely harsh lesson, such that he has no thought of ever being at odds with the law again.

       4.      <u>The need for the sentence imposed to protect the public from further crimes of the defendant.</u>

Unlike many defendants this Court sees, Joe is a respected business and family man with, other than traffic citations, no criminal background before the events leading to his current conviction. The circumstances that led to his conviction are unique and isolated, and nothing

---

cleaning solutions or personal protective equipment."); Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 56 (Declaration of Joanna Perales) (plaintiffs and other individuals at Lompoc "do not have access to hand sanitizer, and are only given one bar of soap each week"); *id.* at 66 (Declaration of Nema Zayed Fears) ("Since the COVID-19 outbreak started, a single mask is the only piece of protective equipment that my father has received. He has had to re-use that mask for weeks."); Emergency Petition for Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3 (Declaration of Kendal Nelson) (describing "unbearabl[ly]" unsanitary conditions).

suggests that Joe will commit crimes in the future. As this Court has stated when it concluded

that release on his own recognizance is appropriate, Joe is not a danger to society. Joe has

learned a terrible lesson and he will not repeat his mistake in the future.

5.    The need for the sentence imposed to provide the defendant with needed
educational or vocational training, medical care, or other correctional treatment in
the most effective manner.

Joe Khalaf does not need the drug rehabilitation or other treatment services offered by the

Bureau of Prisons, and in fact, does not qualify, as he does not have any drug, alcohol, or mental

illness issues. *See* PSR ¶¶ 78-79. The BOP's facilities are better utilized for those who need

further rehabilitation.

Joe does not need any education or vocational training from the BOP. His health is better

cared for in the community than from a jail or prison. And incarceration would present a serious

and immediate danger to Joe. Prisons' and jails' inability to care for aging individuals, like Joe

Khalaf, is well-documented and concerning. According to the OIG, even before COVID-19,

BOP lacked appropriate staffing levels and infrastructure to meet the needs of aging individuals.

U.S. Dep't of Justice, Office of the Inspector Gen., *The Impact of an Aging Inmate Population

on the Federal Bureau of Prisons* 17-19 (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/

e1505.pdf. People could wait years for even routine medical equipment – like glasses or

dentures. *Id.* Because Joe Khalaf's advanced age places him at particularly high-risk for severe

complications if he were to contract the virus, the need for effective medical care is all the more

critical. *See* CDC, *Coronavirus Disease 2019 (COVID-19): Older Adults*, https://bit.ly/2AjtwfQ.

(8 out of 10 deaths reported in the U.S. have been in adults 65 and older).

6.      <u>The need to avoid unwarranted sentence disparities among defendants with</u>
<u>similar records who have been found guilty of similar conduct.</u>

In Joe's case, this factor is compelling, and the need to avoid unwarranted sentence

disparities counsels for a sentence to probation, at most. Almost everyone else investigated or

prosecuted for violations of 18 U.S.C. §1159 were either 1) not charged, 2) prosecuted civilly,

or, 3) if prosecuted criminally, sentenced to a period of probation. At this time, only one known

case of an 18 U.S.C. §1159 conviction ended with a term of imprisonment (6 months).[6]  That

single outlier case – detailed below – involved ongoing, blatant deception; Judge Herrera

referred to it during the sentencing hearing as "ongoing" "brazen" "intentional" "dup[ing]" of

unknowing jewelry purchasers. Even under those circumstances, none of which are present here,

a sentence of 6 months was sufficient to serve the purposes of sentencing. That conduct is

egregious in comparison to Joe's single act here, which did not involve even one representation

(even implicitly) designed to mislead regarding the source of jewelry but, instead, was the

placement of a small box of imported ornamental silver canteens, displayed such that the

reasonable possibility existed that unknowing consumers in the wholesale business of Al-Zuni

Global Jewelry may have mistaken them for having been made by a Native American. Setting

aside this single outlier sentence of incarceration, the other District of New Mexico defendants

who have been found guilty of violations of § 1159 of the Indian Arts and Crafts Act have

engaged in conduct much more culpable than Joe, and have all been sentenced to probation only.

Under those circumstances, §3553(a)(6)'s policy to avoid sentencing disparities counsels the

Court to sentence Joe to probation at most.

---

[6] *United States v. Ali et al.*, 1:15-CR-3762-JCH.

17

Whereas 18 U.S.C. § 3553(a)(6) provides that the Court must consider the need to avoid unwarranted sentencing disparities, the Tenth Circuit recognizes that the disparity consideration applies as well to sentencing *similarities* among defendants who *are not similarly situated*. *See United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008). Under the circumstances of the conduct to which Joe pleaded guilty, § 3553(a)(6) supports that the Court should sentence Joe similarly to those sentenced to probation, and not to Nael Ali, the sole person sentenced to imprisonment.

"While similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record." *United States v. Goddard*, 929 F.2d 546, 550 (10th Cir. 1991) (citing *United States v. Jackson,* 921 F.2d 985, 988 (10th Cir. 1990) and *United States v. Sardin,* 921 F.2d 1064, 1067 (10th Cir. 1990)). *See also U.S. v. Garza*, 1 F.3d 1098, 1101 (10th Cir. 1993) (same). For example, in *Goddard* the court found a sentencing disparity between co-conspirators justified where the other conspirators were not as involved as Goddard, and were also not aware of a gun, which Goddard was. *Id.*

In the drug case of *United States v. Garza*, Garza's co-defendant Avila was sentenced to 33 months. 1 F.3d at 1099 (10th Cir. 1993). While Garza's guideline range came out to 57-60 months, because of the disparity, the district court departed downward and sentenced Garza to 41 months. *Id.* The Tenth Circuit found this departure unwarranted as the different culpabilities warranted the disparity in the sentences. As the court explained: "Under the sentencing guidelines, the policy statements, and the official commentary of the Sentencing Commission, the only disparities which are to be avoided are *unwarranted* disparities. Here, the disparity in sentences is clearly explicable by the facts on the record." *Id*. at 1101 (emphasis in original). In

18

coming to this conclusion, the Tenth Circuit compared Garza's extensive involvement to the

limited involvement of his co-defendant Avila:

> In this case, there is no evidence of similarity in the participation, culpability, criminality, and conduct of Garza and Avila. Garza became involved in the Mexico drug organization in early 1991 and had been actively involved for over a year. Avila had been a member of the organization for only a few days. Garza had been involved in delivering or receiving monies due on at least 1,145 pounds of marijuana, while Avila had been present only on one occasion, during the delivery of 250 pounds of marijuana. Based on (1) Garza's conduct and role in this particular offense, (2) the fact that Garza approached the Mexico drug organization and sought employment, (3) Garza's delivery of marijuana for shipment on local freight lines, (4) Garza's delivery of 100 to 150 pounds of marijuana to Oklahoma City on four or five occasions, (5) Garza's collection of monies due and owing for previous marijuana deliveries, and (6) Garza's compensation for this drug activity, Garza was clearly not a minimal participant. Avila, on the other hand, was a minimal participant. He received the benefit of an appropriate adjustment as provided in U.S.S.G. section 3B1.2(a).

*Id.* Thus, *Garza* instructs that defendants with disparate culpability should be sentenced

to disparate sentences.

Just as defendants with disparate culpability should expect disparate sentences,

defendants with similar culpability should receive similar sentences. This Court, in *United States*

*v. Lee,* provided a downward departure in just such a case. 376 F. Supp.2d 1276 (D.N.M. 2005)

(Browning, J.). In doing so, the Court explained that "[o]ne of the factors considered by the

Court is 'the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct.'" *Id.* at 1282 (quoting 18 U.S.C. §

3553(a)(6)). In providing the justification for the downward departure for a codefendant in the

drug trafficking crime, this Court explained:

> One of Lee's co-Defendants, Ellis, who was in the car with Lee and who was arrested at the same time as Lee, *see* PSR ¶ 116, at 29, was eligible for the safety valve and received a sentence of 87 months. *See* Judgment at 1 (filed November 19, 2004). At the sentencing hearing, however, the United States acknowledged that Lee and Ellis were of similar culpability in terms of the drug trafficking crime for which they were arrested. *See* Transcript of Hearing at 11:14–17; *id.* at 19:4–15. While the Court believes that Lee should serve a longer sentence because he possessed a firearm in connection with the drug trafficking offense, the difference between Ellis' sentence and the Guidelines

19

> sentence creates too great of a disparity between defendants who are otherwise of equal culpability. The difference between Lee's sentence of a statutory minimum of 120 months and Ellis' sentence of 87 is sufficient, but not greater than necessary, to more effectively promote the sentencing goals that 18 U.S.C. § 3553(a) outlines. The Court believes a sentence of 120 months is reasonable and will more effectively promote the sentencing goals outlined in 18 U.S.C. § 3553(a). The sentence is sufficient, without being greater than necessary, to comply with the purposes set forth in the Sentencing Reform Act.

*Id.* at 1282-83.  It is this recognition – that similarly culpable defendants should be similarly sentenced – that leads to the inexorable conclusion that only a sentence of probation would be equitable in Joe's case.

A review of New Mexico's 18 U.S.C. §1159 cases paints the picture of civil and non-custodial deterrence accompanied by monetary penalties. Only one outlier – a single case – resulted in an actual sentence of confinement of 6 months.[7] But in relation to sentencing disparities, the actions of that defendant were blatant, ongoing and egregious – distinguishable from Joe's for many reasons. In even further contrast, a number of *possible* cases notably appear to be blatant egregious misrepresentations, but they were never even prosecuted.

In *United States v. Ali*, 1:15-cr-3762-JCH, the defendant, Nael Ali, was caught in persistent fraud, which was recorded by the United States. He pled to blatant intentional fraudulent acts, which spanned over a year and a half. *See* Ali Plea Agreement ("Ali PA") at ¶¶ 10-12 Ex.G. Not only did he intentionally misrepresent that non-Native American made jewelry was instead authentic, but he went so far as to make a list of fake jewelry makers and even train

---

[7] In that case, *United States v. Ali*, 1:15-cr-3762-JCH, the plea agreement included an agreed-to range of 0-18 months' incarceration, and the government pushed hard for the 18 months. *See U.S. v. Ali*, United States' Sentencing Response, at 18-24, Ex. F. The government's sentencing memorandum response shows the relative seriousness of Ali's multiple egregious explicit misrepresentations, compared with the passive, aberrant, conduct of, out of all of the jewelry at Al-Zuni Global Jewelry, placing one box of canteens on a shelf labeled Indian-made here.

his employees to tell customers that the overseas-manufactured jewelry was instead Indian-produced by one of the fake Native American artists on that fraudulent list. *Id.* ¶ 11. Ali admitted in his plea agreement that he intentionally and personally represented that all of his Native American-style jewelry was real Native American-made jewelry. *Id.* ¶ 12. Moreover, he falsified the name of a non-existent Navajo artist (Calvin Key) in order to sell $25 rings for $270 and admitted to selling 5 such rings (marked with "CK") in his plea agreement. *See U.S. v. Ali*, Sentencing Transcript of May 10, 2018 at 35:17–37:13, Ex. H; Ali PA ¶ 11.

Judge Herrera clearly recognized the level of Ali's culpability. At sentencing she made the following remarks:

> Now, Mr. Ali engaged in conduct that was ongoing. It was not a one-time thing. And again, I'm talking about what I see in Mr. Ali's admission in the plea agreement. And some of the language that is here in this plea agreement, I mean I have to tell you, it sounds pretty brazen to me. It sounds like not only were people duped, but intentionally so.

*U.S. v. Ali*, Ali Sentencing Transcript of August 28, 2018, at 67:10–13, Ex. I. Despite the facts and admissions discussed, Judge Herrera's recognition of the seriousness, and the government's request for an 18-month sentence, Judge Herrera imposed a 6-month sentence only. As noted above, Ali's sentence is an outlier. All other New Mexico cases resulted in non-custodial deterrence.

Indeed, in contrast to the discussed six months for Ali, the resulting sentence for his co-defendant Manasra[8] was 2 days or time served (whichever is less) and one year of supervised release. Despite this probationary sentence, the factual basis for Mr. Manasra's plea also shows a high degree of culpability. Specifically, in addition to displaying Native American-style items in

---

[8] Christina Bowen was charged in the original indictment, but not prosecuted after a superseding indictment naming only Ali and Manasra.

a misleading manner, Manasra, **_intentionally_** stated items were Zuni and Navajo, while he knew the items were made in the Philippines. Manasra Plea Agreement ("Manasra PA") ¶ 10, Ex. J.

In *United States v. Morris*, Cr. No. 05-1378 JC, there was brazen, intentional duping of consumers commensurate with Ali's, but the Honorable John E. Conway nevertheless sentenced the defendant, Rose Morris, to only five years of probation notwithstanding that Morris pleaded guilty to two violations of § 1159 of the Indian Arts and Crafts Act. In *Morris*, Rose Morris sold rugs that she knew were not Native American-made as Native American-made and even told multiple consumers that members of her family spent years weaving the rugs. *See U.S. v. Morris*, Plea Agreement ("Morris PA") ¶¶ 8(a)(2) & (3), Ex. K. Morris admitted that she purchased rugs that had tags labeled "Made in Mexico" or "Made in India," or labels from a manufacturer in El Paso, Texas, and that she told purchasers, including an undercover FBI agent, that the rugs she sold were woven by her sister-in-law, her sister, her mother, and a non-existent niece, providing actual names for all of those purported weavers. *See id.* In the indictment in that case, Morris was charged with ten counts of violations of § 1159, spanning a period of ten months. *See U.S. v. Morris*, Indictment, at 1-5, Ex. L. The counts to which Morris pleaded guilty occurred over eight months: in March of 2004 and November of 2004. *See* Morris PA ¶¶ 8(a)(2) & (3). Even in the face of these brazen misrepresentations to consumers over at least an 8-month time period, and even with Morris having pled guilty to two separate violations of the Indian Arts and Crafts Act, in which she admitted to intentionally misrepresenting nine rugs as Navajo-made, the Honorable John E. Conway sentenced Morris to probation only. *See U.S. v. Morris*, Amended Judgment 1-8-8, at 2, Ex. M.

Likewise, in *United States v. Alvarez*, Cr. No. 12-2210 LFG, the Honorable Lorenzo F. Garcia, sentenced the defendant, Andrew Gene Alvarez, to only 30 months of probation,

22

notwithstanding that Alvarez falsely held himself out to be an enrolled member of a Native

American tribe, but was not, and marketed and sold his jewelry as Native American-made.

Moreover, in relation to knowingly violating § 1159 of the Indian Arts and Crafts Act, Alvarez

continued to market his jewelry as Native American-made after the Indian Arts and Crafts Board

informed him two years before any of the alleged illegal conduct "that it is a violation of the

Indian Arts and Crafts Act, 18 U.S.C. § 1159, for any person who is not an enrolled member of a

recognized Native American tribe to market their work in any manner which suggests that their

work is an Indian product." *U.S. v. Alvarez*, Plea Agreement ("Alvarez PA") ¶ 7, at 5, Ex. N. The

Indictment charged Alvarez with unlawful displaying for sale, and the unlawful sale, of

approximately $5,100 worth of jewelry "in a manner that falsely suggested and falsely

represented these jewelry items to be Indian produced . . . [,] which he then knew to be a false

representation." *U.S. v. Alvarez*, Indictment, at 1, Ex. O. Alvarez's plea agreement demonstrates

that he displayed for sale multiple items of jewelry, as the unlawful sale of jewelry took place at

a booth at the Native Treasures show at the Santa Fe Community Convention Center, with "a

placard identifying the Defendant as Colville/Apache Indian," neither of which tribes was

Alvarez a member. Alvarez PA, ¶ 7, at 6-8.

Looking at these four examples of violations of § 1159 of the Indian Arts and Crafts Act,

Joe's culpability is of an order significantly lower, to the extent one may reasonably even

compare Joe's conduct to these other past defendants. Section 1159 of Title 18 of the United

States Code criminalizes the affirmative offering, or the passive displaying, of any good "in a

manner that falsely suggests it is Indian produced." In Ali's case, as with his co-Defendant

Manasra, and Alvarez and Morris, there were ongoing verbal affirmative misrepresentations;

these defendants told bald-face lies to people, stating that items were made by Navajos or Zuni

tribal members, or that they themselves were a tribal member, when they were not. Moreover, the Indian Arts and Crafts Board actually informed Alvarez that it had no record he was an enrolled member of any tribe that would allow him to lawfully market his goods as Native American-made in compliance with § 1159 of the Indian Arts and Crafts Act, and advised him that to continue marketing and selling his goods as he was, as American Indian-made, violated § 1159. Notwithstanding that warning, and directly contrary to that warning, Alvarez continued to illegally market his products, and was caught and sentenced.[9]

In contrast, Joe pled to a single count based on a single passive display that he recognized was potentially reasonably misleading. There was no ongoing brazen deception as with the other cases, and not a single previous warning that the Indian Arts and Crafts Board felt Sterling Islands or Joe were doing anything inappropriate.

To the contrary, Sterling Islands and Joe made sure that the Sterling Islands jewelry was marked "Made in Philippines," marketed the jewelry as overseas-made, and informed purchasers and prospective purchasers that to sell it as anything else violates the law. Sterling Islands and Joe continually correctly and honestly identified their imported jewelry to consumers as overseas-made, even in every private email conversation they had with customers and potential customers. Thus, in stark contrast to Ali selling jewelry explicitly as "Native American" and going so far as to invent a list of fake artists to lend some additional credibility to the

---

[9] Alvarez was not the only person to receive a letter warning of violations of the Indian Arts and Crafts Act. The Indian Arts and Crafts Board, from 2006 to 2010, sent out 290 similar letters to persons violating the Indian Arts and Crafts Act advising them of their violations, educating them or warning them of the crimes and penalties, and demanding that they cease and desist or risk criminal prosecution. *See* U.S. Gov't Accountability Off., *GAO-11-432, Misrepresentation of Indian Arts and Crafts* 14 (2011). In contrast, neither Sterling Islands nor Joe ever received any such letter, notwithstanding that the investigation into Nash Khalaf and his co-defendants began sometime before 2004.

misrepresentations, Sterling Islands and Joe labeled properly the jewelry as "Made in Philippines" and marketed and sold it as such.

Joe's actions, including fostering a culture of truth and candor at Sterling Islands, contrast starkly to Ali's conduct, and warrant a disparate, lower sentence than Ali's sentence. "Here, [a] disparity in sentences is clearly explicable by the facts on the record." *Garza,* 1 F.3d at 1101. Joe is clearly less culpable, like the less-culpable, and lesser-sentenced, defendants in *Garza* and *Goddard*. When looking at the majority of 18 U.S.C. § 1159 prosecutions – some of which still have more culpable defendants than Joe, all of these cases led to civil penalties, probation or outright dismissal.[10] As this Court has noted, avoiding disparity with dismissed defendants is also a consideration. In *United States v. Carlos*, this Court varied downward, partly based on the fact that "given that the charges against Hunter [the more culpable defendant] were dismissed the Court believes that the sentence avoids unwarranted sentencing disparities among similarly situated defendants." 2012 WL 1378516 at *8  (D.N.M. 2012) (unpublished) (Browning, J.).[11]

---

[10] Cases investigated as §1159 violations that led to State criminal or civil prosecutions of which Joe is aware include:

> *State of New Mexico v. Amro A. Al-Assi*, No. D-1113-CR-200600208 (McKinley County D. Ct. Dec. 26, 2007). Resulted in a deferred sentence and small monetary penalty.

> *State of New Mexico v. Mohammed Sulieman, Jamal Sulieman, and Golden Bear Trading, Inc.,* No. D-0101-CV-200802466 (Santa Fe County D. Ct. July 29, 2009). This was a civil case that resulted in a consent decree basically requiring the defendants to comply with § 1159 going forward and providing for a small monetary contribution.

> *State of New Mexico v. Yousef Nassar, d/b/a Santa Fe Indian Jewelry*, No. D-0101-CV-200802467 (Santa Fe County D. Ct. Aug. 27, 2009). This was another civil case, which initially resulted in a stipulated preliminary injunction and then was later dismissed for lack or prosecution.

[11] These defendants were dismissed due to a successful suppression motion. *Id*. at *8.

Sentencing Joe below the sentences imposed on Manasra, Morris and Alvarez would be "clearly explicable by the facts on the record." *Garza,* 1 F.3d at 1101. In *Morris*, the Defendant pleaded guilty to mispresenting rugs as American Indian-made, by her family, over an 8-month period and involving nine rugs. In *Alvarez*, Alvarez marketed his non-Native American-made jewelry as Native American-made at several Native American art markets over several years. And he marketed it as Native American-made, brazenly, after the Indian Arts and Crafts Board sent him a letter informing him that his continuing to do so was against the law (the same law with which he was charged and to which Joe pleaded guilty). Here, Joe admitted that, out of all of the jewelry that he sold, there was one incident of one box of canteens at Al-Zuni Global Jewelry that knowingly could have been mistaken as having been Native American-made. Thus, as in *Lee*, the multiple, brazen affirmative misrepresentations that Manasra, Morris and Alvarez made over much longer periods of time establish that Joe clearly is less culpable than Manasra, Morris and Alvarez.

But the Court cannot sentence Joe to a term of incarceration less than that to which Manasra, Morris or Alvarez were sentenced to reflect Joe's lesser culpability, because they were sentenced to probation only notwithstanding their greater culpability. Thus, under this Court's reasoning in *Lee*, and to more effectively promote the sentencing goals that 18 U.S.C. § 3553(a) outlines, the Court properly should sentence Joe at least equivalent to Morris and Alvarez: to probation only. By sentencing Joe to a period of probation, this Court, will "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *U.S. v. Lee,* 376 F. Supp.2d at 1282 (quoting 18 U.S.C. § 3553(a)(6)).

7.     The need to provide restitution to any victims of the offense.

As detailed in the PA and PSR, Joe and the co-Defendants entering pleas in this case will

release their claim to the $288,738.94 the United States seized. In addition, they have agreed to collectively provide a total of an additional $300,000 to the Indian Arts and Crafts Board, an agency within the Department of Interior whose mission is to "promote the economic development of American Indians and Alaska Natives through the expansion of the Indian arts and crafts market." Joe has worked his entire adult life in the southwestern-style jewelry business. He remains available to assist the Board in furthering those aims through the use of these funds. The funds will be paid over a period of four years from the date of the judgment in this case as more fully set forth in a promissory note the parties executed.

Overall, the 18 U.S.C. §3553 sentencing factors all speak to a sentence of probation for Joe.

**B.    Additional Considerations.**

In addition to the 18 U.S.C. §3553 sentencing factors, The PSR acknowledges "Factors That May Warrant A Sentence Outside of The Advisory Guideline System." PSR ¶ 103. The PSR specifically noted several factors warranting a sentence outside of the advisory guideline sentence including:

> The defendant is an elderly 7[2]-year-old male receiving his first felony conviction which is non-violent in nature.
>
> The defendant has six children, four of whom reside outside the United States.
>
> . . . .
>
> The defendant . . . . is currently residing in Saudi Arabia with his [wife and] daughter[s] . . . .

The additional, extremely important factor not included in the PSR is the current COVID-19 pandemic and the obvious danger it poses to Joe if incarcerated. While this has been addressed in several sections, *supra*, it is also an appropriate consideration under a USSG § 5H1.1 departure for age. "Age may be a reason to depart downward in a case where the

defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration." *Id.* While Joe is not currently infirm, his age, as thoroughly discussed, puts him at grave risk and gives this Court yet another reason to ensure he is not incarcerated and sentence him to probation.

Overall, when passing the Sentencing Reform Act of 1984, Congress made clear that alternatives to incarceration are "generally appropriate[e]" for individuals like Joe – a person with no criminal history convicted of a non-violent offense. 28 U.S.C. § 994(j). Even before the COVID-19 pandemic, a sentence of probation would have better served the purposes of 18 U.S.C. § 3553(a). But now, a sentence of probation is particularly warranted.

## **CONCLUSION**

For all the reasons stated above and in Jawad "Joe" Khalaf's Objections to his PSR, Joe Khalaf respectfully requests this Court sentence him to a period of probation.

Respectfully submitted,

PEIFER, HANSON, MULLINS & BAKER, P.A.

By: */s/ Matthew M. Beck*
         Mark T. Baker
         Matthew M. Beck
20 First Plaza, Suite 725
Albuquerque, New Mexico 87102
Tel:    (505) 247-4800
Fax:    (505) 243-6458
Email: mbaker@peiferlaw.com
         mbeck@peiferlaw.com

*Attorneys for Defendants Sterling Islands, Inc. and Jawad "Joe" Khalaf*

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that on August 17, 2020, the foregoing notice was filed electronically through the District of New Mexico's CM/ECF system, and that a copy of the foregoing pleading was served electronically on all counsel of record.

PEIFER, HANSON, MULLINS & BAKER, P.A.

By: */s/ Matthew M. Beck*
        Matthew M. Beck